IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PARTNERS COFFEE COMPANY, LLC, )
                               )
        Plaintiff,             )
                               )
        vs.                    )        Civil Action No. 09-236
                               )
OCEANA SERVICES AND PRODUCTS   )
  COMPANY and JAMES S. GILSON, )
                               )
        Defendants.            )

### MEMORANDUM OPINION

Pending before the Court are two motions by Defendants Oceana Services and Products Company ("Oceana") and James S. Gilson ("Gilson.") The first seeks to dismiss five of the nine counts of the Second Amended Complaint (Doc. No. 35, "Sec. Am. Comp.") filed by Plaintiff Partners Coffee Company, LLC ("Partners"), on August 28, 2009. The second motion seeks a ruling by the Court that the jury demand in the Second Amended Complaint should be stricken. For the reasons below, Defendants' motion to dismiss is granted in part and denied in part; the motion to strike the jury demand is denied.

**I.   BACKGROUND**

A.   Factual Background[1]

Both Oceana and Partners are in the business of roasting, producing, and selling coffee along with coffee-related products. In 2008, Partners agreed with Gilson, the sole shareholder of

---

[1]   Unless otherwise noted, the facts in this section are taken from the Second Amended Complaint.

Oceana, to purchase substantially all of Oceana's assets.   In connection with the Asset Purchase Agreement ("APA") which the parties anticipated, Gilson, both personally and on behalf of his company, made certain representations and warranties with regard to the financial condition of the company, the status of its accounts, and the condition of certain equipment and machinery.

The APA was signed on May 2, 2008 (*see* Motion to Dismiss, Exhibit A.)[2]  Simultaneously, Partners and Oceana entered into a second agreement under which Gilson would provide certain consulting and advisory services to Partners for an initial period of about three years in exchange for a monthly fee and possible bonuses based on performance, customer retention, and the company's earnings. (*See* id., Exhibit B, "Consulting Agreement.")

According to Plaintiff, shortly after Partners took over Oceana's business, it discovered that many of the representations in the APA were false.   Partners contends, for instance, that Gilson falsified his company's financial statements, misrepresented the condition of major equipment in the coffee roasting facility, and failed to disclose the existence of certain creditors of the company.  These failures and misrepresentations compelled Partners to pay off larger amounts of bank debt than it expected, incur

_____

[2]  Although neither of the two agreements between the parties is attached to the Second Amended Complaint, we may consider them because their authenticity is not in doubt and Partners' claims are based, at least in part, on the documents.  *See* Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993); Delaware Nation v. Pennsylvania, 446 F.3d 410, 413, n.2 (3d Cir. 2006).

substantial repair costs, and make unanticipated payments to creditors in order to keep the business viable.

In addition, Partners came to believe that Oceana was violating the Consulting Agreement, particularly the requirement that Gilson and Oceana refrain from competing with Partners while the Consulting Agreement was in effect and for two years thereafter. Partners also claims that Gilson intercepted and diverted payments which were due to Partners, contacted customers to compete for certain coffee-related services, and surreptitiously installed a computer device which allowed him to log into Partners' computer system and obtain confidential business information and trade secrets.

B.   <u>Procedural Background</u>

Partners filed suit against Oceana in this Court on February 17, 2009, alleging fraud, breach of the Consulting Agreement, conversion, tortious interference with business relations, violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, misappropriation of trade secrets, improper procurement of information, and trespass. A first amended complaint (Doc. No. 5), filed on February 25, 2009, asserted the same claims but added Gilson as a Defendant. With their answer (Doc. No. 23), Oceana and Gilson filed a four-count counterclaim against Partners, alleging breach of both the APA and the Consulting Agreement, fraud in connection with both agreements, and unjust enrichment.

Partners filed a motion to dismiss the fraud and unjust enrichment counterclaims on May 4, 2009 (Doc. No. 25), arguing they were barred by the "gist of the action" doctrine.  The motion was denied without prejudice in an Order of Court dated July 28, 2009 (Doc. No. 33), after the Court was advised in a case management conference that Plaintiff intended to further amend its complaint.

The Second Amended Complaint, filed on August 28, 2009, brings the following claims:

```
Count I        Breach of the Asset Purchase Agreement
Count II       Fraud in connection with the APA
Count III      Breach of the Consulting Agreement
Count IV       Conversion
Count V        Tortious interference with business relations
Count VI       Violation of the Computer Fraud and Abuse Act
Count VII      Misappropriation of trade secrets
Count VIII     Improper procurement of information
Count IX       Trespass
```

All claims are made against both Oceana and Gilson except for Count III which is only against Oceana.[3]

On September 8, 2009, Oceana and Gilson filed the now-pending motion to dismiss (Doc. No. 37, "Mot. Dis."), arguing that the claims of fraud, conversion, tortious interference with business relations, improper procurement of information, and trespass are barred by the gist of the action doctrine.  Alternatively, the tortious interference and improper procurement claims should be dismissed for failure to state a claim upon which relief can be

_____

[3]  Gilson was a formal party only to the APA although the Consulting Agreement provided that he personally would provide the services contemplated thereunder.

4

granted.

On September 25, 2009, Oceana and Gilson filed a motion to strike the jury demand made in the Second Amended Complaint, arguing that Partners had waived trial by jury in the Consulting Agreement (Doc. No. 41, "Mot. Strike.")

The parties having fully briefed these motions, they are now ripe for decision.

## II.   JURISDICTION AND VENUE

The parties agree that Partners is a Delaware limited liability company whose sole member is a citizen of Pennsylvania; Oceana is a Georgia corporation with a principal place of business in Marietta, Georgia; and Gilson was a resident of the state of Georgia,[4] thus the parties are completely diverse in citizenship. The amount in controversy is agreed to be greater than $75,000.00, thereby satisfying the second requirement for this Court to have jurisdiction under 28 U.S.C. § 1332.  The parties further agreed in the APA to personal jurisdiction by a state or federal court sitting in Allegheny County, Pennsylvania (APA, ¶ 14.8), and Defendants do not dispute Plaintiff's assertion that venue is proper in this Court under 28 U.S.C. § 1391.

---

[4]  On October 3, 2009, the Court was advised that Mr. Gilson died on September 17, 2009.

## III. ANALYSIS

### A.   Motion to Dismiss Pursuant to the "Gist of the Action" Doctrine

1. *Defendants' Arguments*: Oceana and Gilson argue that the claims for fraud, conversion, tortious interference with business relations, improper procurement of information, and trespass must be dismissed because these tort claims essentially duplicate the breach of contract claims and are wholly dependent on the terms of the APA and the Consulting Agreement. Since the tort claims refer or relate to duties or obligations expressly identified in the agreements, under Pennsylvania's "gist of the action" doctrine, Plaintiff is precluded from bringing claims which merely restate and duplicate the breach of contract claims brought in Counts I and III of the Second Amended Complaint. Therefore these five Counts must be dismissed. (Brief in Support of Defendants' Motion to Dismiss, Doc. No. 38, "Defs.' Brief Mot. Dis.," at 3-11.)

2. *Applicable Law*: Pennsylvania courts are generally cautious about permitting tort recovery on contractual breaches. Glazer v. Chandler, 200 A.2d 416, 418 (Pa. 1964). The "gist of the action" doctrine is a common law theory[5] "designed to maintain the

---

[5]   The Pennsylvania Supreme Court has not expressly adopted the gist of the action doctrine.  However, both the United States Court of Appeals for the Third Circuit and the Pennsylvania Superior Court have predicted it would do so.  See Williams v. Hilton Group PLC, No. 03-2590, 2004 U.S. App. LEXIS 4980, *3 (3d Cir. Mar. 17, 2004), and eToll, Inc. v. Elias/Savion Adver., Inc., 811 A.2d 10, 14 (Pa. Super.

conceptual distinction between breach of contract claims and tort claims" by precluding "plaintiffs from recasting ordinary breach of contract claims into tort claims." eToll, Inc. v. Elias/Savion Adver., 811 A.2d 10, 14 (Pa. Super. Ct. 2002) (internal citation omitted); see also Werwinksi v. Ford Motor Co., 286 F.3d 661, 680 n.8 (3d Cir. 2002). The doctrine bars tort claims:

> (1)  arising solely from a contract between the parties;
>
> (2)  where the duties allegedly breached were created and grounded in the contract itself;
>
> (3)  where the liability stems from a contract; or
>
> (4)  where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract.

Hart v. Arnold, 884 A.2d 316, 340 (Pa. Super. Ct. 2005) (citations omitted); see also Lombardi v. Allstate Ins. Co., CA No. 08-949, 2009 U.S. Dist. LEXIS 52951, *25-*26 (W.D. Pa. June 23, 2009).

The fact that "a plaintiff may not sue in tort for economic losses arising from a breach of contract, however, does not preclude the possibility of a tort action between parties to a contract." Valley Forge Convention & Visitors Bureau v. Visitor's Servs., Inc., 28 F. Supp.2d 947, 951 (E.D. Pa. 1998).

> Under the 'gist of the action' test, "to be construed as a tort action, the [tortious] wrong ascribed to the defendant must be the gist of the action with the contract being collateral. . . .The important difference

---

Ct. 2002); see also Woods v. ERA Med LLC, CA No. 08-2495, 2009 U.S. Dist. LEXIS 3965, *24, n.11 (E.D. Pa. Jan. 21, 2009), citing other cases.

between contract and tort actions is that the latter lie
from the breach of duties imposed as a matter of social
policy while the former lie for the breach of duties
imposed by mutual consensus."

Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc., 247 F.3d 79,

103-104 (3d Cir. 2001), *quoting* Redevelopment Auth. of Cambria

County v. International Ins. Co., 685 A.2d 581, 590 (Pa. Super. Ct.

1996) (*en banc*).

If a separate or independent event has occurred which gives
rise to the tort, a party to a contract may pursue such an action,
despite the existence of other contractual duties.  Knit With v.
Knitting Fever, Inc., CA No. 08-4775, 2009 U.S. Dist. LEXIS 98217,
*11 (E.D. Pa. Oct. 20, 2009); Sunburst Paper, LLC v. Keating Fibre
Int'l, Inc., CA No. 06-3959, 2006 U.S. Dist. LEXIS 78890, *7 (E.D.
Pa. Oct. 30, 2006) (to determine if the gravamen of the claim
sounds in contract or in tort, the court must ascertain the source
of the duties allegedly breached.)  In short, "if the duties in
question are intertwined with contractual obligations, the claim
sounds in contract, but if the duties are collateral to the
contract, the claim sounds in tort."  Sunburst Paper id.; *see also*
eToll, 811 A.2d at 14.

"Whether the gist of the action doctrine applies in any
particular setting is a question of law."  Knit With, 2009 U.S.
Dist. LEXIS 98217 at *13.  A court should be cautious when
determining that a claim should be dismissed under the gist of the
action doctrine, due in part to the fact that Federal Rule of Civil

8

Procedure  8(e)(2)[6]  allows  parties  to  plead  multiple  claims  as
alternative theories of liability.

Keeping these principles in mind, we turn to each of the tort
claims Defendants seek to have dismissed.

3.  *Count II - Fraud*:  Count II would be more accurately
entitled "Fraud in the Inducement" and pertains only to two aspects
of the Asset Purchase Agreement;[7] no fraud is alleged pertaining to
the Consulting Agreement.  Plaintiff first claims that before the
parties entered into the Asset Purchase Agreement, Gilson falsified
Oceana's accounts receivables and revenues by creating "ghost
purchase orders and invoices."  This false information was then
provided to third party banks which made loans to Oceana in the
mistaken belief that the loans would be secured by these assets.
As part of the APA, Partners agreed to pay off these inflated

---

[6]  "A party may set forth two or more statements of a claim or
defense alternatively or hypothetically, either in one count or
defense or in separate counts or defenses.  When two or more
statements are made in the alternative and one of them if made
independently would be sufficient, the pleading is not made
insufficient by the insufficiency of one or more of the alternative
statements.  A party may also state as many separate claims or
defenses as the party has regardless of consistency and whether based
on legal, equitable, or maritime grounds."  Fed. R. Civ. P. 8(e)(2).

[7]  Plaintiff also alleges that Gilson misrepresented that Oceana
had fully complied with the Georgia Bulk Sales Law by notifying
Oceana's creditors that Plaintiff would not assume Oceana's trade
indebtedness.  In fact, however, Defendants failed to disclose that
certain creditors had not been provided with the legally required
notice; consequently, Partners was obliged to make payments to those
creditors to assure continuity of services.  (Sec. Am. Comp., ¶ 17,)
This misrepresentation is not explicitly referred to as one of the
actions which comprised the fraudulent inducement to enter into the
APA as described in Count II.

loans. (Sec. Am. Comp., ¶¶ 14-15, 35-36; Response to Defendants' Motion to Dismiss, Doc. No. 39, "Plf.'s Resp. Mot. Dis.," at 3-4.) Second, Gilson misrepresented the condition of certain equipment at the coffee roasting facility which in fact had significant defects, resulting in substantial repair and replacement costs and lost productivity. (Sec. Am. Comp., ¶¶ 16, 30.) Partners argues that these actions go well beyond any contractual duty set forth in the APA and implicate the larger social policies served by tort law. By analogy with several other fraudulent inducement cases which district courts in this circuit have allowed proceed -- at least through discovery -- this claim should not be dismissed. (Plf.'s Resp. Mot. Dis. at 4-6.)

Apparently recognizing that the claim of fraud as it pertains to the condition of the coffee roasting equipment (Sec. Am. Comp., ¶ 37) essentially duplicates the breach of contract claim about the same issue (id., ¶ 30), Plaintiff does not address this issue in its response to the motion to dismiss. To the extent, then, that Count II attempts to state a claim for fraudulent inducement based on the condition of the equipment, such a claim is dismissed.

Under Pennsylvania law, a breach of contract claim requires the plaintiff to allege: (1) the existence of a contract, (2) breach of a duty imposed by the contract, and (3) damages. Sullivan v. Chartwell Inv. Partners, LP, 873 A.2d 710, 717 (Pa. Super. Ct. 2005). To determine if the alleged fraud is "interwoven" with the

breach of contract claims, we must first examine more closely the details of Count I.   Plaintiff alleges that Gilson and Oceana breached the Asset Purchase Agreement by overstating the value and condition of certain assets as compared to the assets which were actually delivered.   Specifically, in addition to the breach based on the allegedly defective equipment, Partners alleges:

(a)   certain encumbrances were understated because Defendants had borrowed against accounts receivables and other assets; and

(b)   Defendants failed to disclose the existence of debts to certain suppliers and vendors, thus impairing the value of the business as a going concern.

(Sec. Am. Comp., ¶ 30.)

According to Defendants, the fraud claim is redundant with the breach of contract claim because Plaintiff has described fraudulent statements which became the basis for a contractual duty.   That is, the APA sets out the rights and obligations of the parties with regard to "accounting books," i.e., financial statements (APA, ¶¶ 2.1.8, 6.5, 8.1.4), accounts receivable and their exclusion from the transaction (id., ¶¶ 2.2, 6.6, and 6.16), and the obligations of the parties with regard to accounts receivables after the closing date (id., ¶ 11.4.)   (Defs.' Brief Mot. Dis. at 5 and 8-9.) We agree that under the contract, Defendants had a duty to provide certain financial statements which were "true and correct" and which "fairly present[ed] the financial position of the Business at the dates indicated and the result of operations and cash flows of

11

the Business for the periods then ended in accordance with [generally accepted accounting principles.]" (APA, ¶ 6.5.) The APA further provided an assurance that the financial records were "complete and correct in all material respects." (Id., ¶ 6.16.)

However, we agree with Plaintiff that the fraud alleged in the Second Amended Complaint occurred before the parties entered into the contracts and did not relate to Defendants' performance under the contract. Pennsylvania law clearly delineates between fraud in the performance of a contract and fraud in the inducement. *See* eToll, 811 A.2d at 14-15, citing cases. Here, the financial records provided at closing could well have "fairly presented" the amount of loans outstanding and could have been "complete and correct" in stating the amounts of those loans. What falls outside the scope of the contract, however, is the allegation that the loans themselves were based on "ghost" assets which Defendants used as security for loans procured before the parties entered into the APA. In short, Plaintiff's position is that it was induced to enter into the APA based in part its belief that the loan amounts were reasonable in light of the projected accounts receivable, only to later find that the loans were based on fraudulent presentations to the banks.

In general, courts are reluctant to dismiss fraud claims early in the litigation, preferring to allow the parties to conduct discovery. *See* U.S. Claims, Inc. v. Saffren & Weinberg, LLP, CA

No. 07-543, 2007 U.S. Dist. LEXIS 88022, *40 (E.D. Pa. Nov. 30, 2007), citing cases, and allowing claim of fraudulent inducement to proceed. We conclude Plaintiff has sufficiently stated fraudulent acts by Defendants which do not arise from a duty imposed by the contracts between the parties. Defendants' motion to dismiss Count II under the gist of the action doctrine is therefore denied without prejudice.

4. *Count IV - Conversion*:  Under Pennsylvania law, conversion is defined as "a serious interference with the chattel of another."  <u>Healthcare Advocates, Inc. v. Harding, Earley, Follmer & Frailey</u>, 497 F. Supp.2d 627, 650 (E.D. Pa. 2007), *citing* Restatement of Torts (2d) § 222.  Alternatively, it can be described as "the deprivation of another's right of property in, or use or possession of a chattel, or other interference therewith, without the owner's consent and without lawful justification." <u>Rahemtulla v. Hassam</u>, 539 F. Supp.2d 755, 776-777 (M.D. Pa. 2008), *see also* <u>McKeeman v. Corestates Bank N.A.</u>, 751 A.2d 655, 659 n.3 (Pa. Super. Ct. 2000).

Plaintiff alleges that soon after it took over the business, it learned that Oceana, through Gilson, had begun "to intercept and deposit into its own bank account certain post-closing customer payments owed to Partners, both by processing payments through Oceana's credit card system and by instructing its former customers to mail payments to Oceana's address." (Sec. Am. Comp., ¶¶ 20-21.)

13

Moreover, Gilson surreptitiously accessed Partners' business computer records by installing a wireless router and thereby gained access to Plaintiff's confidential business information and trade secrets.  (Id., ¶¶ 23-25.) According to Plaintiff, these acts of diverting its mail and accessing its computer system each involved conduct which is actionable irrespective of the APA and Consulting Agreement because such conduct implicates the larger social policies of tort law.  (Plf.'s Resp. Mot. Dis. at 6-7.)

Defendants argue that this claim arises out of Paragraph 11.4 of the APA which deals with accounts receivables and payment by either party of receivables properly due to the other.  (Defs.' Brief Mot. Dis. at 5-6, 9, citing Rahemtulla, 539 F. Supp.2d at 777 (a conversion claim should be dismissed under the gist of the action doctrine where the entitlement to the chattel is predicated solely on the agreement between the parties.)

We agree with Defendants that the conversion claim potentially duplicates a breach of contract claim with regard to the APA and, in fact, Plaintiff specifically states that "Partners had a right to certain payments from customers after the closing on the asset purchase agreement." (Sec. Am. Comp., ¶ 48.)  Thus, to the extent Partners contends that diversion of these payments from itself to Defendants was conversion, such a claim is clearly intertwined with

the identified provision in the APA.[8]  Similarly, the claim that
Defendants diverted "mails delivered by customers to Partners"
would appear to be intertwined with the parties' intentions that
the assets purchased included "all of [Oceana's] right, title and
interest in and to the assets, properties and rights of every kind.
. .which are used or useful in the conduct of the Business."  (APA,
¶ 2.1.)  However, Plaintiff does not allege that these actions were
explicit breaches of the Asset Purchase Agreement in Count I of the
Second Amended Complaint.

Finally, we do not find the third part of the conversion
claim, i.e., that Defendants improperly accessed Partners' computer
system in order to gain confidential business information, to be
intertwined with any contract provision since it is understood in
our society that businesses will not interfere with each other's
confidential information whether bound to each other by contract or
not.  *See* United States v. Al Hedaithy, 392 F.3d 580, 594 (3d Cir.
2004), *quoting* Carpenter v. United States, 484 U.S. 19, 26 (1987)
for the principle that "[c]onfidential information acquired or
compiled by a corporation in the course and conduct of its business
is a species of property to which the corporation has the exclusive
right and benefit."  Although this claim may be redundant with the
claims for misappropriation of trade secrets, violation of the

---

[8]  Plaintiff appears to concede this point inasmuch as the
conversion claim based on diversion of payments is not addressed in
its response to the motion to dismiss.

Computer Fraud and Abuse Act, improper procurement of information, and trespass, it will be allowed to proceed at this point.  *See* Capresecco v. Jenkintown Borough, 261 F. Supp.2d 319, 322 (E.D. Pa. 2003) (redundant claims may all be valid) (internal quotation omitted.)

Summarizing our findings on Count IV, the conversion claim based on Defendants' alleged diversion of confidential data from Plaintiff's computer system will be allowed to proceed.  As currently stated, the other two parts of the conversion claim – interception of payments from customers and diversion of customers' mail - are sufficiently intertwined with Count I, breach of the Asset Purchase Agreement, that they must be dismissed.  Partners may, if it wishes, file a third amended complaint alleging breach of the relevant Asset Purchase Agreement provisions.  *See* Alston v. Parker, 363 F.3d 229, 235 (3d Cir. 2004) ("even when a plaintiff does not seek leave to amend, if a complaint is vulnerable to. . .dismissal, a District Court must permit a curative amendment, unless an amendment would be inequitable or futile.")

     5.   *Count V – Tortious Interference with Business Relations*:   This claim rests on allegations that after Partners took over the business, Gilson and Oceana interfered with certain business relationships Partners consequently had with third parties by directing them not to make payments to Plaintiff or do business with it. Gilson and Oceana also allegedly diverted to its own use

mail delivered by customers to Partners. (Sec. Am. Comp., ¶¶ 55-58.) Partners again argues that Defendants' active encouragement of third parties not to fulfill their contracts with Partners and their diversion of customer communications falls outside the scope of the contract obligations not to compete; therefore, this claim should be allowed to continue. (Plf.'s Resp. Mot. Dis. at 7-8.)

Defendants argue that this claim must be dismissed because when a defendant's breach of contract has the incidental consequence of affecting a plaintiff's business relationships with third persons, the action lies only in contract. (Defs.' Brief Mot. Dis. at 6, *citing* Chrysler Credit Corp. v. B.J.M., Jr., Inc., 834 F.Supp 813, 843 (E.D. Pa. 1993).) Non-compete issues and confidentiality matters are explicitly addressed in Paragraphs 6.1 and 6.2 of the Consulting Agreement and thus Count V is inextricably intertwined with the contracts and must be dismissed. (Defs.' Brief Mot. Dis. at 10.)

As the Third Circuit Court of Appeals has noted in a case with parallel facts and allegations,

> [Plaintiff] correctly claims that it has a right to be free from -- and [Defendant] has a corresponding duty not to commit -- certain kinds of interference in its business dealings. But [Plaintiff] does not have a right to be free from competition and [Defendant] has no duty "imposed by law as a matter of social policy" not to compete with [Plaintiff.] Only a contract can confer such a right and impose such a duty.

Chemtech Int'l, Inc. v. Chem. Injection Techs., Inc., No. 05-2296, 2006 U.S. App. LEXIS 6865, *11 (3d Cir. Mar. 8, 2006). The Court

17

of Appeals went on to find that because the source of the duty not to compete which the defendant had allegedly violated could only arise from the contract between the parties, the district court had not erred in finding that the alleged tortious interference was, in fact, a violation of the defendant's contractual obligations.  Id. at *11-*12.

Similarly, we conclude here that Partners' claims that Defendants interfered with certain relationships between Plaintiff and its customers arise only from the covenants Oceana made in connection with the Consulting Agreement.  That agreement sets forth in great detail provisions requiring Oceana to maintain confidentiality "at all times," including after the term of the agreement, and to refrain from soliciting "directly or indirectly" any Partners customer or owning any interest in a Partners competitor during the term of the agreement and for two years thereafter.  (Consulting Agreement, ¶ 6.)  Had there been no agreement between Plaintiff and Defendants in this regard, Oceana and Partners would have been free to compete in the open market place for the business of the customers in question.

Again, Plaintiff has not alleged a breach of the Consulting Agreement based on these actions, but may amend its complaint to do so, if it wishes.  The claim for tortious interference brought in Count V will be dismissed at this point inasmuch as it is inextricably interwoven with Defendants' contractual duties under

18

the Consulting Agreement.

6.  *Count VIII - Improper Procurement of Information*:
Under Section 759 of the Restatement of Torts (First), "One who,
for the purposes of advancing a rival business interest, procures
by improper means information about another's business is liable to
the other for the harm caused by his possession, disclosure, or use
of the information."  Ideal Aerosmith, Inc. v. Acutronic United
States, Inc., CA No. 07-1029, 2007 U.S. Dist. LEXIS 91644, *26-*27
(W.D. Pa. Dec. 13, 2007).  A viable claim based on this theory must
allege  that  the  defendant  acquired  confidential  business
information through misconduct.  Id. at *27, *citing* Den-Tal-Ez,
Inc. v. Siemens Capital Corp., 566 A.2d 1214, 1231 (Pa. Super. Ct.
1989).  The information must be considered confidential, although
it need not rise to the level of a trade secret.  Den-Tal-Ez, id.

    Plaintiff's claims in Count VIII are based on the allegation
that Gilson placed a wireless router on Partners' computer and used
it to transfer confidential business information to a remote
computer or storage device.  Defendants therefore "possessed, used,
or disclosed" that information without authority. (Sec. Am. Comp.,
¶¶ 72-73.) This action, if proven, would satisfy the requirement of
"misconduct" by the defendant in making a tort claim for improper
procurement of information.

    While recognizing that Section 759 of the Restatement of Torts
has been adopted by Pennsylvania courts as a basis for recovery,

Defendants argue that this claim is redundant with the misappropriation of trade secrets claim brought in Count VII (which they do not seek to have dismissed) and that the duty not to possess, disclose or use the information arises only from the contracts between the parties. (Def.'s Brief Mot. Dis. at 7.)

We disagree with Defendants' argument. A claim for improper procurement of business information is similar to a claim for misappropriation of trade secrets.[9] "[M]isappropriation of trade secrets is based on a violation of a non-contractual duty to retain confidences, as a matter of social policy rather than by mutual consensus." <u>FedEx Ground Package Sys. v. Applications Int'l Corp.</u>, CA No. 03-1512, 2008 U.S. Dist. LEXIS 107896, *31-*32 (W.D. Pa. Sept. 12, 2008). We find the same analysis should apply to improper procurement of information since the two torts are almost identical, varying only as to the complexity of the information.

In sum, even if there had been no contracts between the parties, under accepted social policy, Defendants had no right to place a wireless router on Partners' computer and divert confidential information. We conclude that the motion to dismiss Count VIII under the gist of the action doctrine must be denied.

7. *Count IX - Trespass*: This claim is again based on the allegation that Gilson surreptitiously installed a wireless router on Partners' computer system which allowed him to access and

---

[9]   See further discussion of this tort in Section B.2. below.

transfer confidential business records. (Sec. Am. Comp., ¶¶ 76-77.)
Plaintiff contends that the claim exists irrespective of the
parties' contractual obligations and thus the gist of the action
for this claim lies in tort, not contract. (Plf.'s Resp. Mot. Dis.
at 8.)

Defendants argue that this claim also lies in contract because
the Consulting Agreement required Oceana not to compete with
Partners nor disclose or use Partners' confidential business
information. Because the purpose of installing the wireless router
was to obtain such information, the trespass claim is inextricably
interwoven with the obligations of Oceana and Gilson under the
Consulting Agreement and is therefore barred. (Defs.' Brief Mot.
Dis. at 7-8; see also Consulting Agreement, ¶ 6 (confidentiality
and non-compete provisions.))

Pennsylvania law defines trespass to chattels as the act of
intentionally "(a) dispossessing another of their chattel, or (b)
using or intermeddling with chattel in the possession of another."
Healthcare Advocates, 497 F. Supp.2d at 650, citing Pestco, Inc. v.
Associated Products, Inc., 880 A.2d 700, 708 (Pa. Super. Ct. 2005);
see also Restatement of Torts (2d), ¶ 217. Here, the act of
installing the wireless router on Partners' computer could be
described as "intermeddling with chattel in the possession of
another." Such an act, if proven, would be entirely separate from
the act of using information thereby acquired to compete with

Plaintiff.    Put another way, had Defendants not received
confidential information via the wireless router or had not used
the information they received to compete with Partners, the
trespass would still have occurred when the router was placed on
the computer.    We conclude that the trespass claim is not
duplicative of the breach of contract claim and will allow it to
proceed.

      B.   Motion to Dismiss Counts V and
          VIII under Fed.R.Civ.P. 12(b)(6)

      1. *Applicable Law:* In the aftermath of <u>Bell Atl. Corp.</u>
<u>v. Twombly</u>, 550 U. S. 544 (2007), <u>Ashcroft v. Iqbal</u>, __ U.S. ___,
129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009), and the Third Circuit
Court of Appeals' interpretation of those two cases in <u>Phillips v.</u>
<u>County of Allegheny</u>, 515 F.3d 224 (3d Cir. 2008), and more recently
in <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203 (3d Cir. 2009), the
pleading standards which allow a complaint to withstand a motion to
dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) have
taken on slightly new parameters.    In <u>Fowler</u>, the Court of Appeals
noted that following <u>Twombly</u> and <u>Iqbal</u>, conclusory "bare-bones"
allegations that "the defendant unlawfully harmed me" no longer
suffice.    A civil complaint must now include "'sufficient factual
matter' to show that the claim is facially plausible." <u>Fowler</u>, 578
F.3d at 210; *see also* <u>Twombly</u>, 550 U.S. at 555, holding that a
complaint which offers only "labels and conclusions" or "a
formulaic recitation of the elements of a cause of action will not

do." The Fowler court further noted that

> after Iqbal, when presented with a motion to dismiss for
> failure to state a claim, district courts should conduct
> a two-part analysis. First, the factual and legal
> elements of a claim should be separated. The District
> Court must accept all of the complaint's well-pleaded
> facts as true, but may disregard any legal conclusions.
> Second, a District Court must then determine whether the
> facts alleged in the complaint are sufficient to show
> that the plaintiff has a plausible claim for relief. In
> other words, a complaint must do more than allege the
> plaintiff's entitlement to relief. A complaint has to
> show such an entitlement with its facts. As the Supreme
> Court instructed in Iqbal, "[w]here the well-pleaded
> facts do not permit the court to infer more than the mere
> possibility of misconduct, the complaint has alleged -
> but it has not shown - that the pleader is entitled to
> relief." This "plausibility" determination will be a
> context-specific task that requires the reviewing court
> to draw on its judicial experience and common sense.

Fowler, 578 F.3d at 210-211 (other internal quotations and citations omitted.)

2. *Analysis:* Because we have already dismissed the claim of tortious interference with business relations under the gist of the action doctrine, we need not consider the parties' arguments that this claim should or should not be dismissed under Rule 12(b)(6). (*See* Defs.' Brief Mot. Dis. at 11-12, and Plf.'s Resp. Mot. Dis. at 8-11.)

Turning to the second part of Defendants' motion, as noted above, Plaintiff claims in Count VIII that Defendants improperly procured confidential information regarding its business practices. Defendants argue that this claim is redundant with Count VII, misappropriation of trade secrets, and that according to the

23

Pennsylvania Uniform Trade Secrets Act, 12 Pa. C.S. § 5308 ("UTSA"), the claim that a defendant misappropriated a plaintiff's trade secrets displaces other tort claims such as improper procurement of information.[10]  (Defs.' Brief Mot. Dis. at 13.)

Plaintiff argues that the UTSA does not pre-empt "other available remedies that are not based upon misappropriation of a trade secret."  Rather, an improper procurement claim rests on the defendant's conduct, not whether the information rises to the level of a trade secret.[11]  (Plf.'s Resp. Mot. Dis. at 11-12.)

As the Pennsylvania Superior Court has noted, misappropriation of trade secrets and improper procurement of information are complementary theories of recovery for the same type of action, depending on the type of information in question.  See Pestco, 880 A.2d at 708-709.  The reviewing court must determine on a case-by-case basis if the confidential business information is a trade

---

[10] Section 5308 of the Pennsylvania UTSA provides: "Except as provided in subsection (b), this chapter displaces conflicting tort, restitutionary and other law of this Commonwealth providing civil remedies for misappropriation of a trade secret."  12 Pa. C.S. § 5308. Subsection (b) provides in relevant part: "This chapter does not affect. . .(2) other civil remedies that are not based upon misappropriation of a trade secret."  Id.

[11]  Under Pennsylvania law, a trade secret is defined as "Information, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use [and] (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  12 Pa. C.S. § 5302.

secret based on whether it has been subject to "substantial secrecy" and its "competitive value to the owner." Id. at 706. We agree with the courts which have proceeded cautiously on the question of preemption under the UTSA at the point of deciding a motion to dismiss. In Cenveo Corp. v. Slater, CA No. 06-2632, 2007 U.S. Dist. LEXIS 9966, *3-*11 (E.D. Pa. Feb. 12, 2007), the court noted that a threshold question concerned the precise content of the information alleged to have been misappropriated or improperly procured. It concluded "the cases holding that the [UTSA] does not preempt common law tort claims when it has yet to be determined whether the information at issue constitutes a trade secret take the better approach" because such cases recognize that if the improper procurement claim were dismissed before discovery and it was later shown that the information in question did not constitute a trade secret, the plaintiff would be left without a remedy for the theft. Id. at *11-*12. As another court from the Middle District of Pennsylvania recognized, the problem

> is that there has been no determination at this juncture as to which confidential and/or proprietary information, if any, can be considered a trade secret as that term is defined in the UTSA. Though the law is unsettled on this issue, the Court is in agreement with the approach taken by the United States District Court for the Eastern District of Virginia, which. . .held that "because it cannot be established at this juncture [the motion to dismiss stage] whether the confidential information at issue in this case is a trade secret, the Court cannot find that [Plaintiff's] claims are preempted [by the UTSA]".

Roger Dubois N. Am., Inc. v. Thomas, CA No. 05-2566, 2006 U.S.

Dist. LEXIS 65674, *10 (M.D. Pa. Sept. 14, 2006), *quoting* <u>Stone</u>
<u>Castle Fin., Inc. v. Friedman, Billings, Ramsey & Co.</u>, 191 F.
Supp.2d 652, 659 (E. D. Va. 2002); *see also* <u>Ideal Aerosmith</u>, 2008
U.S. Dist. LEXIS 33463 at *17 ("Where there has been no
determination that the information at issue constitutes a trade
secret within the purview of [the UTSA], courts have been reluctant
to dismiss related state law claims.")

Defendants' motion to dismiss the improper procurement of
information claim will be denied without prejudice but may be
raised again at a more appropriate point in this litigation.

In sum, the motion to dismiss (Doc. No. 37) is granted in part
and denied in part, as set forth in more detail in the Order of
Court which accompanies this Memorandum Opinion.

     C.   <u>Motion to Strike Jury Demand</u>

     1.   *Defendants' Arguments*: Defendants argue that the
jury demand first made in the Amended Complaint and reiterated in
the Second Amended Complaint should be stricken because the
Consulting Agreement contained a jury trial waiver clause. The
Asset Purchase Agreement, in turn, required that the Consulting
Agreement be delivered to Partners at the closing and recognized
that the Consulting Agreement was a material part of the APA. The
jury waiver clause of the Consulting Agreement is therefore
integrated into the APA and, because all four conditions a court
considers in order to determine if the waiver was knowing and

intentional have been satisfied, the Court should strike the jury demand.   (Brief   in   Support   of   Defendants'   Motion   to   Strike Plaintiff's Demand for a Jury Trial, Doc. No. 42, "Defs.' Brief Mot. Strike.")[12]

Relying   heavily   on   <u>Kroblin   Refrigerated   Xpress,   Inc.   v. Pitterich</u>, 805 F.2d 96, 108-109 (3d Cir. 1986), Defendants argue that if the Consulting and Asset Purchase Agreements are construed together and interpreted as a whole, the intent of the parties to waive the right to a trial by jury extends to all matters related to their May 2008 transaction, even though the waiver appears only in the Consulting Agreement and not in the APA. (Reply Brief in Support of Defendants' Motion to Strike, Doc. No. 51.)

2.   *Applicable   Law*:   Under   Federal   Rule   of   Civil Procedure 39(a), where one or more of the parties has made an appropriate demand, the case is to be tried before a jury unless "the court upon motion or of its own initiative finds that a right of trial by jury of some or all of [the] issues does not exist under the Constitution or statutes of the United States." As this

---

[12]   We note for the record that in their answer and counterclaims (Doc. No. 23), Defendants also demanded a jury trial. However, in the reply brief concerning this issue, Defendants waive their right to trial by jury. (*See* Doc. No. 51 at 4.) As counsel for Defendants are undoubtedly aware, a complaint may not be amended by pleadings submitted in support of a dispositive motion. *See,* e.g., <u>Bell v. City of Philadelphia</u>, No. 06-3960, 2008 U.S. App. LEXIS 8896, *6 (3d Cir. Apr. 23, 2008), *quoting* <u>Shanahan v. City of Chi.</u>, 82 F.3d 776, 781 (7th Cir. 1996), for the well-established principle that "[a] plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment."

Court has recently stated, the right to trial by jury provided under the Seventh Amendment[13] to the United States Constitution

> is fundamental and courts indulge every reasonable presumption against waiver. Nevertheless, like all constitutional rights, the right may be waived.  To be valid, a jury waiver must be made knowingly and voluntarily based on the facts of the case.  The burden of proving that a jury waiver was done both knowingly and voluntarily falls on the party seeking enforcement of the waiver clause.

Henricks Commerce Park, LLC v. Main Steel Polishing Co., CA No. 09-23, 2009 U.S. Dist. LEXIS 73030, *8-*9  (W.D. Pa. Aug. 18, 2009) (internal citations omitted.)

In federal actions based on diversity jurisdiction such as this, the right to a jury trial is determined as a matter of federal law; similarly, federal law controls the validity of a contract clause waiving trial by jury. DaimlerChrysler Fin. Servs. Ams., LLC v. Woodbridge Dodge, Inc., CA No. 06-5225, 2009 U.S. Dist. LEXIS 59828, *20 (D. N.J. July 14, 2009), citing Simler v. Conner, 372 U.S. 221, 222 (1963).  "A contractual waiver that is made knowingly and voluntarily is a valid waiver for claims that (1) involve the parties to the contract; and (2) arise out of the contract." Joseph Oat Holdings, Inc. v. RCM Digesters, Inc., CA No. 06-4449, 2007 U.S. Dist. LEXIS 62879, *7 (D. N.J. Aug. 24, 2007) (citations omitted.)

---

[13]   "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . . ."  U.S. Const. amend. VII.

3.   *Plaintiff's Arguments*: Partners concedes that the claims for breach of the Consulting Agreement, violation of the Computer Fraud and Abuse Act, misappropriation of trade secrets, improper procurement of information, and trespass all related to the Consulting Agreement and thus, the jury trial demand in the Second Amended Complaint does not apply to those claims. (Response to Defendants' Motion to Strike Plaintiff's Demand for a Jury Trial, Doc. No. 48, "Plf.'s Resp. Mot. Strike," at 2.)  However, Partners disagrees that it also waived its right to a jury trial on claims for breach of the Asset Purchase Agreement, fraud in connection with the APA, conversion, and tortious interference with business relations.  Partners contends that Defendants "stretch the reach" of the clause waiving the right to a jury trial in the Consulting Agreement when they claim it should also apply to claims arising from the APA.  While Plaintiff agrees with Defendants that the two agreements should be construed jointly, they rely on a different case from the Third Circuit Court of Appeals which held that although multiple documents must be construed together, the provisions of one are not necessarily "imported bodily into another."  (Plf.'s Resp. Mot. Strike at 3, *quoting* <u>USX Corp. v. Prime Leasing, Inc.</u>, 988 F.2d 433, 438 (3d Cir. 1993).)  According to Partners, Defendants are attempting to "pluck" the jury waiver clause from the Consulting Agreement and insert it into the APA despite the fact that the latter does not incorporate the terms of

the Consulting Agreement and both agreements contain merger clauses which make it clear that the parties did not intend such incorporation.  (Plf.'s Resp. Mot. Strike at 3-6.)

   4.  *Discussion and Conclusion*: We begin our analysis by considering the language of the two agreements.  The Consulting Agreement contains a provision which states:

> <u>Waiver of Jury Trial</u>.  [Partners] and [Oceana] hereby knowingly, voluntarily and intentionally waive any right they may have to demand a trial by jury in respect of any litigation arising out of, under or in connection with this Agreement.

(Consulting Agreement, ¶ 15.)

  The Consulting Agreement further provides that execution thereof is "a condition precedent and an inducement to" Partners' willingness to enter into the APA.  (<u>Id.</u>, Recital C.)  Finally, it includes an integration clause:

> <u>Complete Agreement</u>.  There are no oral representations, understandings or agreements with [Partners] or any of its members, managers or representatives covering the subject matter as [sic] this Agreement.  This written Agreement is the final, complete, and exclusive statement and expression of the agreement between [Partners] and [Oceana] with respect to the subject matter hereof, and of all the terms of this Agreement, and this Agreement cannot be varied, contradicted or supplemented by evidence of any prior or contemporaneous oral or written agreements.  This written Agreement may not be modified except by a further writing signed by [Partners] and [Oceana], and no term of this Agreement may be waived except by [a] writing signed by the party waiving the benefit of such terms.

(Consulting Agreement, ¶ 10.)

  The Asset Purchase Agreement, in turn, provides that Oceana

30

and Partners will deliver an executed copy of the Consulting Agreement to each other at the closing. (APA, ¶¶ 5.2.6 and 5.4.6.) It also contains the following integration clause:

> Entire Agreement. This Agreement (including the Exhibits and Schedules hereto) constitutes the entire agreement and understanding between the Parties as to the matters set forth herein and supersedes and revokes all prior agreements and understandings, oral and written, between the Parties with respect to the subject matter hereof. No amendment or attempted waiver of any of the provisions hereof shall be binding upon any Party unless set forth in an instrument in writing signed by the Party to be bound or their [sic] respective successors in interest.

(APA, ¶ 14.6.)

The Asset Purchase Agreement contains no provision waiving or requiring a jury trial.

We are reluctant to grant Defendants' motion to strike the jury trial demand for two reasons. First, the waiver clause in the Consulting Agreement states that the parties are waiving their right to a jury trial "in respect of any litigation arising out of, under or in connection with *this* Agreement." The phrase "this Agreement" would appear to limit the scope of the waiver clause to the Consulting Agreement. Moreover, the APA refers to other agreements, e.g., assignment and assumption agreements, a trademark assignment, and a restrictive covenants agreement. (*See* APA, ¶¶ 5.3 and 5.4.) The parties do not provide any of these documents and do not argue that any of them contains or does not contain a clause waiving the right to a jury trial. If we were to accept Defendants' reasoning that the waiver clause in the Consulting

31

Agreement applies to the APA, logically it would follow that the parties waived their rights with regard to all the other agreements as well.  At this point in time, based on the record before us, we cannot be confident that such was the intent of the parties.

Second, we find the facts of this case distinguishable from those of Kroblin on which Defendants rely.  In Kroblin, the point of contention was the enforceability of a non-compete agreement ancillary to an agreement for the sale of capital stock in a company called Fleetwood.  The lower court had determined that the two agreements were separate transactions and the non-compete agreement was unenforceable for lack of consideration; the defendant, Pitterich, argued on appeal that the $100,000 payment to him for his stock included consideration for his interest in the company and the non-compete agreement as well.  Having examined both agreements to ascertain whether the non-compete agreement was incorporated by reference into the main agreement, the court found two factors which were critical to its holding.  First, it was undisputed that the two agreements were entered into simultaneously and that they referred to each other.  Kroblin, 805 F.3d at 107-108.  Second, the Court concluded that the two must be read together because no single writing embodied the whole of the agreement.  When that was done, the Court concluded the non-compete agreement was enforceable because it was an integral part of the sales agreement and supported by adequate consideration in the form

of the promise to pay Pitterich $100,000.  Id. at 108-109.

Our situation is similar to that in Kroblin in that the agreements in question were entered into simultaneously as part of the same transaction.  However, the second criterion for finding a complete integration of the two agreements is missing in our case. The court in Kroblin relied on the fact that the parties explicitly stated that

> [Kroblin] would not enter into said Agreement with [Pitterich] to purchase his shares of capital stock of Fleetwood, and, in turn, to control A.C.E., unless [Kroblin] was afforded a reasonable opportunity to continue the business of A.C.E. and the opportunity to retain the customers of A.C.E. without the competition of [Pitterich] in the same territory with customers with which he has had long business relationships.

Kroblin, 805 F.3d at 108.

The court described this provision and a second reference to the parties' understanding that the sale would not go forward without the non-compete agreement as the "*sine qua non* of entering into the agreement of sale."  Id.  Here, while the Consulting Agreement was described as a "condition precedent to" and an "inducement for" Partners entering into the APA, the Asset Purchase Agreement lists several other conditions precedent which must be fulfilled or performed at or prior to the closing in order for Partners to be obliged to proceed with the APA.  Despite the language in the Consulting Agreement, execution of that document is not listed as a condition precedent in the APA itself.  (*See* APA, Art. X.)  This would imply that unlike the parties in Kroblin,

33

Partners and Oceana were not explicitly relying on the Consulting Agreement as the *sine qua non* of the Asset Purchase Agreement.

We find the facts of this case more similar to those of the case relied upon by Partners, i.e., <u>USX Corp. v. Prime Leasing, Inc.</u>, *supra.* There, the dispute focused on the question of whether nonrecourse provisions in a security agreement and in a note to which USX and Prime Leasing were parties also applied to a collateral assignment agreement into which they had entered as part of the same transaction. Again the court examined all three documents but this time concluded that each nonrecourse provision limited its application to breach of the document in which it appeared and it was "plain that neither of these nonrecourse provisions should be construed as limiting USX's remedies for Prime's breach of its obligations in the Collateral Assignments." <u>USX Corp.</u> 988 F.2d at 438. Thus, the court held that

> regardless of the various interrelationships of the agreements, it is clear as a matter of contract law that the applicability of certain provisions may be limited to the documents in which they actually appear. Even where several instruments pertaining to one transaction must be construed together, "the provisions of one instrument are not thereby imported bodily into another. The application of the rule does not result in actual consolidation of the several contracts."

<u>Id.</u> at 437-438, *quoting* <u>Sterling Colorado Agency, Inc. v. Sterling Ins. Co.</u>, 266 F.2d 472, 476 (10th Cir. 1959) ("Each of several instruments may be construed in the light of the others, without their being considered as one for all purposes"), and 17A C.J.S.

Contracts § 298; 17A Am. Jur. 2d Contracts § 388 ("Construing contemporaneous instruments together means simply that if there are any provisions in one instrument limiting, explaining, or otherwise affecting the provisions of another, they will be given effect. . . .This does not mean that the provisions of one instrument are imported bodily into another;. . .they may be intended to be separate instruments and to provide for entirely different things.")

The parties to the contracts in this transaction are both sophisticated businesses who obviously recognized the importance of a jury trial waiver clause. Waiver of a jury trial is such a serious undertaking in our system of jurisprudence that we are not persuaded that the waiver clause in the Consulting Agreement should be "imported bodily" into the Asset Purchase Agreement.

Defendants' motion to strike the jury demand with regard to Counts I, II and IV of the Second Amended Complaint is denied. Count V having been previously dismissed, the motion to strike the jury demand in that regard is denied as moot.

An appropriate Order follows.

December 3rd, 2009

_____
William L. Standish
United States District Judge