IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PARTNERS COFFEE COMPANY, LLC, )
                               )
        Plaintiff,             )
                               )
        vs.                    )    Civil Action No. 09-236
                               )
OCEANA SERVICES AND PRODUCTS   )
  COMPANY and JAMES S. GILSON, )
                               )
        Defendants.            )

## MEMORANDUM OPINION

Pending before the Court is a motion by Plaintiff Partners Coffee Company, LLC ("Partners") (Doc. No. 65), seeking to dismiss certain counterclaims raised by Defendants Oceana Services and Products Company ("Oceana") and Anne C. Gilson ("Mrs. Gilson.")[1] For the reasons below, the motion to dismiss is granted in part and denied in part.

## I.  BACKGROUND

### A.  Factual Background

The facts of this case are set out in detail in the Memorandum Opinion dated December 4, 2009 ("the December Opinion"), and will not be reiterated here. Suffice it to say that a May 2008 Asset Purchase Agreement ("APA") between Oceana and Partners

---

[1] On October 3, 2009, the Court was advised that James S. Gilson, one of the original Defendants in this matter, had died on September 17, 2009. (Doc. No. 45.) On December 3, 2009, the Court granted Oceana's motion to substitute Anne C. Gilson, executrix of her husband's estate, for Mr. Gilson. (Doc. No. 57.)

allegedly incorporated numerous false representations about the
condition of coffee roasting equipment, accounts receivable, and
the status of creditors which only came to light after Partners
purchased substantially all of Oceana's assets.   Partners also
believed Oceana was violating a Consulting Agreement between the
parties under which Oceana's principal, James S. Gilson ("Gilson")
would provide advisory services to Partners for a period of three
years.   In particular, Partners alleged that Gilson and Oceana had
violated the provision that they would refrain from competing with
Partners while the Consulting Agreement was in effect.   Plaintiff
also claimed that Gilson intercepted and diverted payments which
were due to Partners, contacted customers to compete for services,
and surreptitiously installed a device which allowed him to log
into Partners' computer system and obtain confidential business
information and trade secrets.

B.   Procedural Background

Partners filed suit against Oceana in this Court on
February 17, 2009, and amended the complaint to include Gilson as
a defendant a few days later.   Oceana and Gilson filed a four-count
counterclaim against Partners, alleging breach of both the APA and
the Consulting Agreement, fraud in connection with both agreements,
and unjust enrichment.   Partners' motion to dismiss the fraud and
unjust enrichment counterclaims was denied without prejudice.   A
Second Amended Complaint was filed on August 28, 2009, and on

December 4, 2009, the Court granted Defendants' motion to dismiss Plaintiff's claims therein for fraud regarding the condition of the coffee roasting equipment, the claim for diversion of customers' payments and correspondence, and the claim for tortious interference with business relations; the motion was denied with regard to all other claims. (Doc. No. 60.) Plaintiff was granted leave to file a Third Amended Complaint which it did on December 21, 2009. (Doc. No. 61.)

On January 11, 2010, Oceana and Mrs. Gilson filed their answer to the Third Amended Complaint (Doc. No. 63), together with counterclaims as follows:

| | |
|---|---|
| Counterclaim I | Breach of the APA |
| Counterclaim II | Breach of the Consulting Agreement |
| Counterclaim III | Fraud in the inducement of both the APA and the Consulting Agreement |
| Counterclaim IV | Negligent misrepresentation |
| Counterclaim V | Piercing the company veil |

All claims are made by both Oceana and Mrs. Gilson except Count II which is brought only by Oceana.

On February 1, 2010, Partners filed the now-pending motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), arguing that all the counterclaims should be dismissed in whole or in part except those pertaining to breach of the Consulting Agreement.

The parties have not raised any objections to the statement of jurisdiction and venue set out in the December Opinion, nor to the

3

standard of review for a Rule 12(b)(6) motion to dismiss discussed therein.  Therefore, the Court dispenses with those statements and adopts the same as in our previous Opinion.  (December Opinion at 5 and 22-23.)

## II.  ANALYSIS

### A.  <u>Counterclaim I – Breach of the Asset Purchase Agreement</u>

In Counterclaim I, Defendants assert that Partners materially breached the APA in three ways:  failing to pay Oceana the purchase price required under the agreement;  improperly retaining accounts receivables; and failing to employ Mrs. Gilson.  (Answer and Counterclaims, Doc. No. 63, "C'claims," ¶ 51.)  In the facts set out in the counterclaim, Defendants allege that the APA required Partners, among other things, to retain Mrs. Gilson as an employee pursuant to ¶4.1 of the APA.  (C'claims, ¶¶ 2-3, 33; *see also* APA, Exhibit A to Doc. No. 63.)

In its brief in support of the motion to dismiss, Partners objects only to the third of these claims, that is, that Partners failed to engage Mrs. Gilson either as an employee or consultant.  Partners first argues that the APA does not list Mrs. Gilson among the employees to be extended an offer of employment.  Although Defendants refer to ¶4.1 of the APA, they fail to provide the schedule pertaining to that paragraph which does not include her

4

name.[2]  Similarly, the Consulting Agreement fails to mention Mrs.
Gilson in any capacity.  In the absence of a contractual duty to
hire Mrs. Gilson, there can be no breach of the APA and therefore
this claim should be dismissed with prejudice.  (Plaintiff's Brief
in Support of Motion to Dismiss Defendants' Counterclaims, Doc. No.
66, "Plf.'s Brief," at 2-3.)

Defendants concede this point and do not oppose Partner's
motion  as  to  the  alleged  breach  concerning  Mrs.  Gilson's
employment.  (Defendants' Brief in Opposition to Plaintiff's Motion
to Dismiss, Doc. No. 68, "Defs.' Brief," at 1.)    Therefore,
Counterclaim I is dismissed insofar as it applies to those claims.[3]

    B.   <u>Counterclaim III - Fraud in the Inducement</u>

A short summary of the events giving rise to Defendants'
counterclaims is required.  Pursuant to the parties' negotiations,
the closing of the APA and associated documents was to occur on

---

[2]  As noted in the December Opinion, the Court may consider the
APA and the Consulting Agreement because the parties rely on them in
both the Third Amended Complaint and in the Counterclaims.  *See*
December Opinion at 2, note 2, *citing* <u>Pension Benefit Guar. Corp. v.
White Consol. Indus.</u>, 998 F.2d 1192, 1196 (3d Cir. 1993); <u>Delaware
Nation v. Pennsylvania</u>, 446 F.3d 410, 413, n.2 (3d Cir. 2006).

[3]  Since Defendants do not object to this allegation being
dismissed insofar as it forms the basis of a counterclaim for breach
of the APA and do not mention Mrs. Gilson's purported employment
elsewhere in their brief opposing the motion to dismiss, the Court has
assumed that they are also willing to dismiss this allegation as the
basis for their claims of fraud in the inducement and negligent
misrepresentation.  Therefore, the Court has omitted further reference
to allegations concerning Mrs. Gilson elsewhere in the counterclaims.

Friday, May 2, 2008 ("the Closing Date.")[4]  The APA provided that "at Closing," Partners would pay the purchase price of approximately $800,000 by means of a wire transfer to an escrow account in the amount of $738,000 and a promissory note in the amount of $62,000, the latter subject to adjustment based on the amount of inventory on hand at the time.  (APA, ¶¶ 3.1 and 3.2.)

Defendants argue that Partners made numerous fraudulent statements intended to induce Oceana and Gilson to enter into the APA and Consulting Agreement.  First, on May 2, Plaintiff was unable or unwilling to pay the purchase price, but stated it would obtain bank financing to pay the full price for the Oceana assets not later than Monday, May 5, 2008, provided Partners received all of the fully executed documents on or before that date.  Second, Partners' agents, i.e., its attorneys, stated that the loan agreement had been completed and funds would be transferred into the escrow account on May 5.  The same day, the attorneys also told Defendants that Partners' principal, Thomas P. Kazas, was out of the country.  When Partners again failed to transfer the necessary funds on May 5, 2008, the attorneys stated on May 8, 2008, that the company was attempting to find an alternative lending source. According to Defendants, Partners' representations regarding bank

---

[4]  The APA provides that the Closing would occur on Friday, May 2, 2008, "or on such other date as may be agreed upon" by the parties, but "in no event later than May 2, 2008, unless otherwise mutually agreed upon by the Parties in writing."  (APA, ¶ 5.1)  Neither party claims that they agreed in writing to postpone the Closing.

financing and alternative sources were fraudulent and intended only to induce Oceana and Gilson into signing the APA and Consulting Agreement; in fact, Partners was undercapitalized. (C'claims, ¶¶ 62-63.)

Oceana further alleges that it was fraudulently induced to enter into the Consulting Agreement as a result of Partners' representation that it would retain Oceana "for the term of the agreement." According to Defendants, Partners did not intend to retain Oceana for the term of the Consulting Agreement or to pay it for such services, but in fact intended to promptly terminate the Consulting Agreement on false pretexts. (C'claims, ¶¶ 62-63.)

Partners argues that the fraud in the inducement claim is barred by the gist of the action doctrine, the parol evidence rule, integration clauses in the APA and the Consulting Agreement, and a lack of justified reliance. (Plf.'s Brief at 3.) We outline the relevant law and will first consider Plaintiff's argument that Defendants' counterclaims are barred by the gist of the action doctrine.

Under Pennsylvania law,

[t]he elements of fraud in the inducement are as follows:

(1) a representation;

(2) which is material to the transaction at hand;

(3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false;

(4) with the intent of misleading another into relying on it;

(5) justifiable reliance on the misrepresentation; and

(6) the resulting injury was proximately caused by the reliance.

Eigen v. Textron Lycoming Reciprocating Engine Div., 874 A.2d 1179, 1185 (Pa. Super. Ct. 2005) (internal quotations and citations omitted); see also Holt v. First Horizon Home Loan, CA No. 06-18, 2007 U.S. Dist. LEXIS 19542, *8 (M.D. Pa. Mar. 20, 2007).

Under the gist of the action doctrine,[5] a plaintiff may not bring a tort claim when that claim is simply a re-statement of a breach of contract claim or when the success of such a claim depends wholly on the terms of the underlying contract. Sunquest Info. Sys., Inc. v. Dean Witter Reynolds, Inc., 40 F. Supp.2d 644, 651 (W.D. Pa. 1999). Although under Pennsylvania law, the gist of the action doctrine is applicable to claims of fraud in the performance of a contract, it is generally held not to apply to claims of fraud in the inducement. Advanced Tubular Prods. v. Solar Atmospheres, Inc., No. 04-2016, 2005 U.S. App. LEXIS 20032, *11 (3d Cir. Sept. 16, 2005), citing eToll, Inc. v. Elias/Savion Adver., Inc., 811 A.2d 10, 17, 20 (Pa. Super. Ct. 2002). That is "because fraud to induce a person to enter into a contract is generally collateral to (i.e., not 'interwoven' with) the terms of the contract itself." eToll, 811 A.2d at 17. In a case analyzing the reasoning of eToll, the Pennsylvania Superior Court explained

---

[5]   Further discussion of the gist of the action doctrine is found in the December Opinion at 6-9 and will not be reiterated here.

that

> the gist-of-the-action doctrine does not necessarily bar a fraud claim stemming from the fraudulent inducement to enter into a contract. . . .   [I]f the fraud did not concern the **performance** of contractual duties, then the gist of the action would be the fraud, rather than any contractual relationship between the parties.

Sullivan v. Chartwell Inv. Partners, LP, 873 A.2d 710, 719 (Pa. Super. Ct. 2005) (emphasis in original), *citing* eToll, 811 A.2d at 19, and Air Prods. & Chems., Inc. v. Eaton Metal Prods. Co., 256 F. Supp.2d 329, 341 (E.D. Pa. 2003).

We read e-Toll to require the Court to consider each of the statements or acts which allegedly induced Oceana and Gilson to enter into the APA and Consulting Agreement and ask if those statements or acts concerned the performance of contractual duties. If the answer is yes, the claim is barred by the gist of the action doctrine.   If the act or statement was collateral to the obligations to which the parties agreed under the contracts, the claim is not barred. *See* Redevelopment Auth. v. International Ins. Co., 685 A.2d 581, 590 (Pa. Super. Ct. 1996) (the focus of the analysis is whether "actions lie from a breach of the duties imposed as a matter of social policy" or from "the breach of duties imposed by mutual consensus.")  Other courts have applied the same test. *See*, e.g., Galdieri v. Monsanto Co., 245 F.Supp.2d 636, 650 (E.D. Pa. 2002); Owen J. Roberts Sch. Dist. v. HTE, Inc., CA No. 02-7830, 2003 U.S. Dist. LEXIS 2997, *6-*8 (E.D. Pa. Feb. 28, 2003); Bryan's Quality Plus, LLC v. Shaffer Builders, Inc., CA No.

07-2311, 2008 U.S. Dist. LEXIS 61713, *10-*14 (E.D. Pa. Aug. 12, 2008); and Morales v. Superior Living Prods., LLC, CA No. 07-4419, 2009 U.S. Dist. LEXIS 91578, *22 (E.D. Pa. Sept. 30, 2009).

When we apply this test to the counterclaims raised by Oceana and Gilson, we conclude that four of the six alleged bases for the claim of fraud in the inducement must be dismissed.

1.   In their counterclaims, Defendants allege that Partners failed to pay at Closing, and in fact, has not yet paid, the full purchase price of the assets.  (C'claims, ¶ 3.)  Their first fraudulent inducement claim arises from a statement made on May 2, 2008, that Partners "was obtaining bank financing to pay the purchase price and that the funding would be completed on May 5, 2008, if Partners received all of the signed closing documents by that date."  (C'claims, ¶ 21).  The obligation of Partners to pay $800,000 "at Closing" was clearly an element of the APA and the alleged failure to do so is just as clearly a breach thereof.  But the allegation that Plaintiff stated it would obtain the financing by the following business day, May 5, 2008, if the other documents were signed could have acted as an inducement for Defendants to sign the agreement on May 2, 2008, which they did.  See Blumenstock v. Gibson, 811 A.2d 1029, 1036 (Pa. Super. Ct. 2002)(fraud in the inducement occurs when a party contends it would not have entered into the agreement "but for" the fraudulent statements made by the other.)  Therefore, the claim of fraudulent inducement based on the

alleged statement by Plaintiff that bank financing was forthcoming will not be dismissed under the gist of the action doctrine.

2. Defendants allege that on May 2, 2008, Partners' attorneys told Mr. Gilson that the loan agreements had been completed and the lender would transfer the funds into the escrow account. (C'claims, ¶¶ 23, 62.b.) Like the statement that Partners would obtain financing by May 5, 2008, this statement could have induced Defendants to sign the agreements on May 2. Therefore, it will not be dismissed under this theory.

3. Defendants allege that on May 8, 2008, they were advised by Plaintiff's attorneys that "Partners was looking into a second lending source and needed to determine which lender was offering the best deal for Partners." (C'claims, ¶ 28.) Oceana and Gilson do not dispute that they signed the APA and Consulting Agreement on May 2, 2008. It follows logically that a statement made six days later cannot have induced Defendants to sign those agreements. See KNK Medical-Dental Specialities, Ltd. v. Tamex Corp., CA Nos. 99-3409 and 99-5265, 2000 U.S. Dist. LEXIS 14536, *13-*14 (E.D. Pa. Sept. 28, 2000) (statement made well after the contract was made cannot serve as the basis for a fraudulent inducement claim); Creative Waste Mgmt., Inc. v. Capitol Envtl. Servs., CA No. 04-1060, 2004 U.S. Dist. LEXIS 21497, *18, n.4 (E.D. Pa. Oct. 22, 2004) ("The gravamen of fraudulent inducement is a false representation made to the injured party *before* the disputed

transaction, but for which, the party would not have agreed to the transaction.") (Emphasis in original.) The motion to dismiss this portion of Counterclaim III is granted.

4. Defendants identify one last point which induced them to enter into the APA. Partners' attorneys allegedly represented to Gilson on May 5, 2008, that they believed Mr. Kazas was "out of the country," but Defendants later learned that he was actually in Las Vegas, Nevada, at the time. Since Defendants acknowledge that this statement was not made until after the documents were executed on May 2, 2008, even if this were determined to be a material misrepresentation, it cannot have induced them to have signed the agreements three days before. This portion of the counterclaims will be dismissed.

5. According to Defendants, Partners stated it would retain Oceana pursuant to the Consulting Agreement "for the term of the agreement" but in fact, both before and after executing the documents, Plaintiff intended to promptly terminate the Consulting Agreement on false pretexts. (C'claims, ¶¶ 62-63.) Defendants allege that after May 2, 2008, and prior to his death, Gilson provided services to Partners as set forth in the Consulting Agreement. (C'claims, ¶ 5.) The Consulting Agreement was to cover the period from May 2, 2008, through April 30, 2011, with an option for Partners to extend the agreement for two consecutive one-year periods thereafter. (Id., ¶ 35.) However, at an unspecified

12

point, Partners "wrongfully purported to terminate the Consulting Agreement" and owes some $105,160 thereunder, plus performance, retention, and contingent bonuses. (C'claims, ¶¶ 35, 40-42.)

The Consulting Agreement provides that it was to continue through April 30, 2011, "unless terminated prior thereto pursuant to the provisions of this Agreement." (*See* Consulting Agreement, Exhibit B to Doc. No. 63, ¶ 2.) Partners had the right to terminate the agreement "for cause effective upon written notice" to Oceana; the agreement enumerated four specific acts by either Oceana or Gilson which would provide such cause for termination. (Id., ¶ 5.) If the contract were terminated for any of those reasons, no further compensation would be due to Oceana and the contract would be "of no further force and effect" except for two provisions concerning confidentiality and return of company property. The alleged wrongful early termination of the Consulting Agreement is therefore fully addressed in the agreement and must be dismissed under the gist of the action doctrine.[6]

6. Finally, in setting out what Defendants believe to have been the true facts as compared to the fraudulent statements which induced them to enter into the agreements, they also allege that Partners was undercapitalized. (C'claims, ¶ 63.g.) There are no allegations, however, that Defendants were led to believe that

---

[6] We further note that Defendants also allege breach of the Consulting Agreement in Counterclaim II, using essentially the same language as in the fraudulent inducement claim. (C'claims, ¶ 58.)

the company was fully capitalized and that such a belief induced them to execute the agreements. (*See* C'claims, ¶ 62, listing the alleged representations by Partners and its authorized agents.) Therefore, this counterclaim is dismissed without prejudice, subject to Defendants' ability to supplement its claims in this regard with factual allegations.

Having disposed of four of six alleged fraudulent statements which induced Defendants to enter into the agreements with Partners under the gist of the action doctrine, we turn to the parol evidence rule for reconsideration of the remaining claims.

Under Pennsylvania law, the parol evidence rule provides:

> [A] written contract, if unambiguous, must be held to express all of the negotiations, conversations, and agreements made prior to its execution, and neither oral testimony, nor prior written agreements, or other writings, are admissible to explain or vary the terms of the contract.

Hart v. Arnold, 884 A.2d 316, 341 (Pa. Super. Ct. 2005).

As the Pennsylvania Supreme Court has further explained:

> An integration clause which states that a writing is meant to represent the parties' entire agreement is. . . a clear sign that the writing is meant to be just that and thereby expresses all of the parties' negotiations, conversations, and agreements made prior to its execution.

> Once a writing is determined to be the parties' entire contract, the parol evidence rule applies and evidence of any previous oral or written negotiations or agreements involving the same subject matter as the contract is almost always inadmissible to explain or vary the terms of the contract.

Yocca v. Pittsburgh Steelers Sports, Inc., 854 A.2d 425, 436-437

(Pa. 2004) (internal citations omitted.)

As the Court pointed out in Yocca, there are two requirements which must be met before the parol evidence rule bars evidence which would otherwise support a claim of fraud in the inducement: (1) the written contract must contain terms which directly deal with the subject matter of the alleged oral representation; and (2) the written contract must represent the entire contract between the parties, as indicated, for example, by an integration clause. Yocca, 854 A.2d at 438; see also 1726 Cherry St. Partnership v. Bell Atlantic Properties, 653 A.2d 663, 666 (Pa. Super. Ct. 1995).

Defendants acknowledge that they are not alleging that the APA or Consulting Agreement contains incorrect terms or that terms to which the parties had agreed were missing from the written contracts; that is, they are not claiming fraud in the execution. They further concede that

> in a case of fraud in the inducement, parol evidence is inadmissible where the contract contains terms that deny the existence of representations regarding the subject matter of the alleged fraud. But when the contract contains no such term denying the existence of such representations, parole evidence is admissible to show fraud in the inducement. [Citing Youndt v. First Nat'l Bank, 868 A.2d 539, 546 (Pa. Super. Ct. 2005).] The latter is Defendants' circumstance.

(Defs.' Brief at 6.)

Defendants allege that representations were made on May 2, 2008, that (1) although Partners did not, at the time, have the full purchase price in hand, funds would be transferred to the

escrow account on May 5, 2008, and (2) loan agreements had been signed by Partners and the lender who would transfer the funds to escrow. As noted above, the APA provided that "at Closing," Partners would pay the purchase price of $800,000 "at the direction of [Oceana] in cash by wire transfer" in the amount of $738,000 and by delivery of a promissory note in the amount of approximately $62,000. (APA, ¶¶ 3.1, 3.2 and 5.4.) The subject matter of the oral representations, payment of the cash price at the Closing, is explicitly addressed in the APA,[7] thus satisfying the first requirement of Yocca, i.e., that the written contract contain terms which directly deal with the subject matter of the alleged oral representations.

Moreover, the APA contains the following integration clause:

> Entire Agreement. This Agreement (including the Exhibits and Schedules hereto) constitutes the entire agreement and understanding between the Parties as to the matters set forth herein and supersedes and revokes all prior agreements and understandings, oral and written, between the Parties with respect to the subject matter hereof. No amendment or attempted waiver of any of the provisions hereof shall be binding upon any Party unless set forth in an instrument in writing signed by the Party to be bound or their respective successors in interest.

---

[7] Except for the fact that execution of the Consulting Agreement (as well as several other agreements which are not the subject of this litigation) was a condition precedent for execution of the APA, the Court is unclear why Defendants are arguing that the representations that funding would be provided on May 5, 2008, induced them to sign the Consulting Agreement. The Consulting Agreement did not provide for any payment at Closing but rather a monthly fee payable on the 15th of each month during the term of the contract and any extensions thereof plus bonuses payable at the end of each "bonus calculation year," the first of which began on May 1, 2008. (Consulting Agreement, ¶ 4.)

(APA, ¶ 14.6)

Comparable language appears in the Consulting Agreement.[8] These integration clauses satisfy the second <u>Yocca</u> requirement, that is, the written contract purports to represent "the entire contract between the parties."

As the court stated in <u>Blumenstock</u>, "the case law clearly holds that a party cannot justifiably rely upon prior oral representations yet sign a contract denying the existence of those representations." <u>Blumenstock</u>, 811 A.2d at 1036. Defendants argue that they relied on Partners' oral representations that the cash portion of the purchase price would be forthcoming, yet signed a contract which contains language stating that the written agreement "supersedes and revokes all prior agreements and understandings, oral and written, between the Parties with respect to the subject matter hereof." The written contracts signed on May 2 thus revoked the oral representations regarding later payment of the cash purchase price, even though the representations were made the same

---

[8] "<u>Complete Agreement.</u> There are no oral representations, understandings or agreements with [Partners] or any of its members, managers or representatives covering the subject matter as [sic] this Agreement. This written Agreement is the final, complete and exclusive statement and expression of the agreement between [Partners] and [Oceana] with respect to the subject matter hereof, and of all the terms of this Agreement, and this Agreement cannot be varied, contradicted or supplemented by evidence of any prior or contemporaneous oral or written agreements. This written Agreement may not be modified except by a further writing signed by [Partners] and [Oceana] and no term of this Agreement may be waived except by writing signed by the party waiving the benefit of such terms." (Consulting Agreement, ¶ 10.)

day as the contracts were signed.  We conclude that the parol evidence bars Defendants' remaining claims for fraud in the inducement in Counterclaim III.

     C.   <u>Counterclaim IV – Negligent Misrepresentation</u>

          Defendants allege that the fraudulent statements outlined in the previous section also give rise to a claim of negligent misrepresentation.      Partners    allegedly    made    these misrepresentations under circumstances in which it ought to have known they were false and made them with the intent of inducing Defendants into executing the Closing documents and delivering them to Partners' legal counsel.  (C'claims, ¶¶ 70-73.)  Plaintiff argues, as above, that the gist of the action doctrine, parol evidence rule, and the integration clauses in the agreements bar these actions.  In addition, the economic loss doctrine bars these claims because Defendants suffered no personal injury or property damage, only alleged economic losses.  (Plf.'s Brief at 9.)  In response to the last argument, Defendants contend that the economic loss doctrine does not bar claims for fraud in the inducement and there is "another narrow exception to the economic loss doctrine for claims of negligent misrepresentation based on § 552 of the Restatement (Second) of Torts."  (Defs.' Brief at 10, *citing* <u>Werwinski v. Ford Motor Co.</u>, 286 F.3d 661 (3d Cir. 2002), and <u>Bilt-Rite Contrs., Inc. v. Architectural Studio</u>, 866 A.2d 270 (Pa. 2005).)

To state a claim for negligent misrepresentation under Pennsylvania law, the complainant must show:

1.   misrepresentation of a material fact;

2.   the party making the statement either (a) knew it was a misrepresentation, (b) made the representation without knowledge as to its truth or falsity, or (c) made the representation under circumstances in which he or she ought to have known of its falsity;

3.   the representor intended the representation to induce another to act on it; and

4.   injury resulted to the party who acted in justifiable reliance on the misrepresentation.

Gibbs v. Ernst, 647 A.2d 882, 890 (Pa. 1994); *see also* Roadtrips, Inc. v. Hutton Group, Inc., CA No. 09-1468, 2010 U.S. Dist. LEXIS 15054, *13-*14 (W.D. Pa. Feb. 22, 2010).

Under the economic loss doctrine,[9] "no cause of action exists for negligence that results solely in economic damages unaccompanied by physical or property damage."  Sovereign Bank v. BJ's Wholesale Club, Inc., 533 F.3d 162, 175 (3d Cir. 2008), *quoting* Adams v. Cooper Beach Townhome Cmtys, L.P., 816 A.2d 301, 305 (Pa. Super. Ct. 2003).   In short, the doctrine "prohibits

---

[9]   As in the case of the gist of the action doctrine, the Pennsylvania Supreme Court has not handed down a decision directly addressing the economic loss doctrine.  In such circumstances, a federal court is charged with predicting how the Pennsylvania Supreme Court would resolve the question at issue, taking into consideration what that court has said in related areas, the decisions of Pennsylvania intermediate courts, federal cases interpreting Pennsylvania law, and decisions from other jurisdictions discussing the issue.  Werwinski, 286 F.3d at 675.  The Pennsylvania Superior Court, in an *en banc* decision, has accepted the doctrine's application.  *See* REM Coal v. Clark Equipment Co., 563 A.2d 128 (Pa. Super. Ct. 1989).

plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract." Werwinski, 286 F.3d at 671 (internal quotation omitted.)   In a number of cases applying Pennsylvania law, "the economic loss doctrine has been construed to hold that negligence, strict products liability, fraud and negligent misrepresentation theories do not apply to actions between commercial enterprises where the only damages alleged are economic losses." Sunburst Paper, LLC v. Keating Fibre Int'l, Inc., CA No. 06-3959, 2006 U.S. Dist. LEXIS 78890, * 11-*12 (E.D. Pa. Oct. 31, 2006), citing cases and dismissing fraud and negligent misrepresentations under the doctrine; see also Scansource, Inc. v. Datavision-Prologix, Inc., CA No. 04-4271, 2005 U.S. Dist. LEXIS 7291, *11-*12 (E.D. Pa. Apr. 26, 2005), applying economic loss theory to negligent misrepresentation claim.

As Defendants note, the courts have carved out two exceptions to the economic loss doctrine.   The first is explained in Werwinksi, where the putative class action plaintiffs brought claims for breach of warranty and fraudulent concealment, alleging that Ford had installed defective components in certain vehicles despite having known about the problems for several years.   The plaintiffs appealed the district court's dismissal of their claim for fraudulent concealment under the economic loss doctrine.[10]  Id.,

---

[10]  In addition, the plaintiffs argued that the lower court had erred by concluding that the economic loss doctrine applied to transactions between manufacturers and ordinary consumers (such as

286 F.3d at 674.  The United States Court of Appeals for the Third Circuit examined in detail the decisions interpreting Florida, Wisconsin, and Minnesota law on which the lower court had relied, as well as decisions criticizing or distinguishing those opinions. Id. at 674-678.  The Court then considered the arguments of the parties in support of their positions, their interpretations of Pennsylvania law, and its own interpretation of that law.  The Court affirmed the district court's decision, concluding that Pennsylvania courts had expressed "a willingness" to limit intentional tort claims which overlap with contract claims as well as a "lack of hospitality to tort liability for purely economic loss."  Id. at 680 (internal quotation omitted.)  Finally, the Court noted that until the Pennsylvania Supreme Court had spoken on this issue, it would "opt for the interpretation that restricts liability, rather than expands it" and would reject the plaintiff's request for an intentional fraud exception to the economic loss

---

themselves) as well as to transactions between commercial enterprises. In a thorough analysis of the doctrine as applied by Pennsylvania courts following the U.S. Supreme Court's decision in East River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 871 (1986), the Court of Appeals upheld the lower court's decision, based on its review of Pennsylvania state court decisions and its prediction that the Supreme Court of Pennsylvania would apply the doctrine to transactions involving "ordinary consumers."  Werwinski, 286 F.3d at 670-674.  The plaintiffs also argued that the district court erred by concluding that the doctrine barred their claims for violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law but again, the Appeals Court agreed that the economic loss doctrine applied to such statutory fraud claims.  Id. at 681.  These aspects of the Werwinski decision are inapplicable here because Defendants make no analogous arguments.

doctrine.  Id. at 680-681.  Thus, it concluded there was no exception to the economic loss doctrine for intentional torts such as fraudulent concealment.

The Court did acknowledge that a fraud-in-the-inducement claim is actionable, despite the economic loss doctrine, if the fraud is extraneous to the alleged breach of contract, that is, the fraud was not inextricably intertwined with the contract claims. Werwinski, 286 F.3d at 676, noting a limited exception for fraud claims "where the claims at issue arise independently of the underlying contract."

It is this exception on which Defendants rely here.  As discussed above, the first two alleged negligent misrepresentations about the APA - that Partners would pay $800,000 for the Oceana assets at Closing and that funds would be transferred by a lender into the escrow account at Closing - are thoroughly interwoven with the breach of contract claims. (See C'claims, ¶ 51.a; see also Werwinski id. at 678, where the Court noted that the tort claims were "undergirded by factual allegations identical to those supporting their breach of contract counts.")  The third claim - that Partners was still attempting on May 8, 2008, to find other sources of funding, and the fourth claim, that Mr. Kazas was out of the country on May 2, 2008, fail to satisfy the elements of a claim for negligent misrepresentation because they were made after Defendants had signed the documents and therefore could not have

22

been intended to induce them to act. *See* <u>Gibbs</u>, *supra,* stating that the misrepresentation must have been intended to induce action on the part of the recipient. With regard to the claim that Partners was undercapitalized, Defendants have failed to allege in their Counterclaims any affirmative oral representation made by Partners regarding its capitalization or any representation in the APA itself on this topic.[11] *See* <u>Cooper v. Sirota</u>, No. 01-3620, 2002 U.S. App. LEXIS 11951, *3-*4 (3d Cir. June 18, 2002), *citing* <u>Kramer v. Dunn</u>, 749 A.2d 984, 991 (Pa. Super. Ct. 2000), for the principle that a negligent misrepresentation claim requires an actual misrepresentation as opposed to assumptions on the part of the recipient. Although it is well-established that a claim of negligent misrepresentation presumes a duty to disclose (*see*, e.g., <u>Bortz v. Noon</u>, 729 A.2d 555, 561 (Pa. 1999)), there is no allegation that Oceana or Gilson sought information about Partners' financial state which it failed to provide. Finally, the alleged misrepresentation concerning the period for which Partners would retain Oceana under the Consulting Agreement is also interwoven with the breach of contract claims. (*See* C'claims, ¶ 58; *see also* <u>Blue Mt. Mushroom Co. v. Monterey Mushroom</u>, 246 F.Supp.2d 394, 403

---

[11] *See* APA, Article VII, Representations and Warranties of Purchaser. The Court recognizes that several exhibits and schedules to the APA have not yet been provided by the parties. We are confident that if any one of those contains a provision concerning Partners' capitalization, Defendants will promptly submit it for review.

(E.D. Pa. 2002) (where defendant stated it would adhere to a contract then failed to do so, plaintiff's negligent misrepresentation claim was merely a restatement of its breach of contract claims.)) We therefore conclude that the possible exception to the economic loss doctrine set out in Werwinski is inapplicable to the facts of this case.

Turning to Defendants' argument regarding a second exception established in Bilt-Rite, we also conclude that exception is equally inapplicable here. In Bilt-Rite, a general contractor brought a negligent misrepresentation against an architect, alleging that the latter's inaccurate plans for a building resulted in significant cost overruns to the contractor who relied on them. The Pennsylvania Supreme Court, adopting the Restatement (Second) of Torts, § 552,[12] held that "to apply the economic loss doctrine in the context of a Section 552 claim would be nonsensical" in cases "where information is negligently supplied by one in the

---

[12] The Restatement of Torts (Second), § 552, entitled "Information Negligently Supplied for the Guidance of Others," provides in pertinent part:

"(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

"(2) . . . [T]he liability stated in Subsection (1) is limited to loss suffered (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction."

business of supplying information,. . . .and where it is foreseeable that the information will be used and relied upon by third persons, even if the third parties have no direct  contractual relationship with the supplier of information." Id., 866 A.2d at 288; see also Fleet Nat'l Bank v. Boyle, CA No. 04-1277, 2005 U.S. Dist. LEXIS 44036, *38 (E.D. Pa. Sept. 12, 2005) (underlying this exception "is the recognition that reliance upon a negligent misrepresentation by a party not in privity with the maker of the misrepresentation may be both justified and foreseeable.")

Although Defendants would have us apply the Bilt-Rite exception to its claims against Partners, it is abundantly clear from all the pleadings filed to date that Partners was not in the business of supplying information, but rather in the business of roasting and selling coffee.  Moreover, the exception set out in Bilt-Rite applies when the parties are not in a contractual relationship and the information in question is supplied to "another in privity" with the plaintiff.  Bilt-Rite, 866 A.2d at 286.   Thus, for both of these reasons, the exception established in Bilt-Rite cannot be applied here.

All the damages sought in the Counterclaims are economic[13] rather than the result of physical or property loss.  Claims of

---

[13]   In the request for relief, Defendants list rescission as a form of relief (see Answer at 24.)  Rescission provides "for restoration of the status quo by requiring the buyer to return what he received from the seller."  Pinter v. Dahl, 486 U.S. 622, 641 n.18 (1988).  Under the facts of this case, rescission therefore can be thought of as a form of monetary damages.

negligent misrepresentation in commercial transactions are barred by the economic loss doctrine in the absence of one of two recognized exceptions, neither of which is applicable here. Therefore, Counterclaim IV is dismissed.

D.   Counterclaim V - Piercing the Company Veil

Defendants allege in their countersuit that in the ten years leading up to the transactions underlying this litigation, Oceana and Gilson had an established business relationship with Hometown Coffee Company ("Hometown") and its president, Mr. Kazas. (C'claims, ¶ 12.)   Prior to the negotiations which culminated in the APA and Consulting Agreement, Mr. Kazas formed a new Delaware limited liability company ("LLC") known as Partners Coffee Company, the entity which actually purchased Oceana's assets.[14]   In Counterclaim V, Oceana and Mrs. Gilson allege that Partners failed to observe company formalities or keep proper company records; Partners had no officers or members other than the Hometown officers and directors; and Mr. Kazas and/or Hometown diverted assets of Partners for their own personal use.   In addition, Partners was insufficiently capitalized; there was an intermingling

---

[14]   As the Court understands the situation from the limited record before it at this point, Hometown Coffee Company was owned by Mr. Kazas and apparently still exists as a separate entity.   Oceana was previously known as Partners Coffee Company, Inc., but became Oceana Services and Products, Inc., concurrently with execution of the APA. (See APA, ¶ 5.2.8.)   Mr. Kazas is the sole member of Partners LLC and a resident of Pennsylvania.   (C'claims, ¶¶ 6-7, 12.)   The APA was signed by Partners LLC, Partners Coffee Company, Inc. (aka Oceana) and Gilson.   The Consulting Agreement was between Partners LLC and Oceana.

of funds between and among Hometown, Partners, and Mr. Kazas personally; Partners' officers, managers and directors, if any, did not function; Partners did not pay distributions in the ordinary course of business; and Mr. Kazas and/or Hometown held themselves out as conducting business affairs without the use of company names and without identifying that their actions were taken as an officer or manager of Partners. In short, Partners is the alter ego of Mr. Kazas and/or Hometown or, alternatively, Partners and Hometown were operated as a single entity. (C'claims, ¶¶ 75-77.) Plaintiff argues that these allegations fail to state a claim against Partners upon which relief can be granted and therefore Counterclaim V must be dismissed. (Plf.'s Brief at 9-10.)

"The law in Pennsylvania is clear that where a party enters into a contract with a corporation, no action will lie against the shareholders of that corporation individually for a breach of that contract." First Realvest, Inc. v. Avery Builders, Inc., 600 A.2d 601, 603 (Pa. Super. Ct. 1991). However, shareholders, officers and directors of a corporation may be held liable for such a breach under the equitable doctrine of "piercing the corporate veil." Id. Although Partners is a limited liability company rather than a corporation, Pennsylvania courts have found that the veil of an LLC may be pierced to the same degree as that of a corporation. See, e.g., Advanced Tel. Sys. v. Com-Net Prof'l Mobile Radio, LLC, 846 A.2d 1264, 1281, n.11 (Pa. Super. Ct. 2004), and Schwab v. McDonald

27

<u>(In re LMcD, LLC)</u>, 405 B.R. 555, 560 (Bankr. M.D. Pa. 2009); each referring to and applying a committee comment to Pennsylvania's LLC statute, 15 Pa. C.S. § 8904(b), which states that "it is expected. . .that in the appropriate case the doctrine of piercing the corporate veil will be applied to a limited liability company." While "there appears to be no clear test or well settled rule in Pennsylvania. . .as to exactly when the corporate veil can be pierced and when it may not be pierced," there is "a strong presumption" against doing so. <u>Advanced Tel.</u>, 846 A.2d at 1277-1278; *see also* <u>Lumax Indus. v. Aultman</u>, 669 A.2d 893, 895 (Pa. 1995) (this presumption applies even when the stock of the corporation is owned entirely by one person.) "Nevertheless, a court will not hesitate to treat as identical the corporation and the individuals owning all its stocks and assets whenever justice and public policy demand." <u>Advanced Tel.</u>, <u>id.</u> at 1278 (internal quotation omitted.) In the absence of a definitive test for piercing the corporate veil under Pennsylvania law, courts generally apply a "totality-of-the-circumstances test" to determine if liability should be imposed on a controlling entity or individual in order to avoid injustice. <u>Plastipak Packaging, Inc. v. DePasquale</u>, Nos. 02-2670 *et al.*, 2003 U.S. App. LEXIS 18978, *4-*5 (3d Cir. Sept. 12, 2003).

Under the related "alter ego" theory, a court may find that when the corporation or person in control of another organization

"uses that control, or uses the corporate assets, to further his or her own personal interests, the fiction of the separate corporate identity may properly be disregarded." Engle v. Matrix Golf & Hospitality Phila., LLC, CA No. 08-5831, 2009 U.S. Dist. LEXIS 44351, *9 (E.D. Pa. Mar. 31, 2009); see also Eastern Minerals & Chems. Co. v. Mahan, 225 F.3d 330, 334, n.6 (3d Cir. 2000). To succeed on the alter ego theory, the party seeking to establish liability must show that the individual who controlled the corporation "wholly ignored the separate status of the controlled corporation and so dominated and controlled its affairs that its separate existence was a mere sham." Eastern Minerals, id. In other words, the complainant must show "that the controlled corporation acted robot- or puppet-like in mechanical response to the controller's tugs on its strings or pressure on its buttons." Id., quoting Culbreth v. Amosa (Pty) Ltd., 898 F.2d 13, 15 (3d Cir. 1990) (per curiam).

When a Pennsylvania court determines whether it should apply the alter ego theory, it should consider a number of factors:

> The failure to observe corporate formalities; non-payment of dividends; insolvency of debtor corporation; siphoning the funds from corporation by dominant shareholders; non-functioning of other officers and directors; absence of corporate records; whether the corporation is a mere facade for the operations of a common shareholder or shareholders; and gross undercapitalization.

Eastern Minerals, 225 F.3d at 334, n.7, quoting Wheeling-Pittsburgh Steel Corp. v. Intersteel, Inc., 758 F.Supp. 1054, 1059 (W.D. Pa.

1990).

Defendants here have provided little or nothing in the way of factual allegations to support their contention that liability should be imposed on Mr. Kazas and/or Hometown by piercing the company veil or applying the alter ego theory.  In fact, the allegations in Counterclaim V consist of nothing more than a list of the factors identified in Eastern Minerals based on Defendants' "information and belief." (*See* C'claims ¶¶ 75-76.)  In the wake of Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007), the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level" and the complaining party must offer "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  Twombly, 550 U.S. at 555. This Court is "not compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation."  Baraka v. McGreevey, 481 F.3d 187, 195 (3d Cir. 2007) (internal quotations and citations omitted.)

In the absence of anything more than a recitation of the elements necessary to hold Hometown and/or Mr. Kazas liable under the piercing of the veil theory or the alter ego theory, Counterclaim V will be dismissed in its entirety.  However, the Court will permit Defendants to amend their counterclaims to cure the shortcomings of their initial pleading inasmuch as we hesitate at this stage of the litigation to find such an amendment would be

30

inequitable or futile. *See* <u>Phillips v. County of Allegheny</u>, 515 F.3d 224, 236 (3d Cir. 2008).

Having considered each of the parties' arguments, Plaintiff's motion to dismiss Defendants' counterclaims is granted in part and denied in part, as set forth in the Order of Court attached hereto.

March __25__, 2010                    _William L. Standish_
                                        William L. Standish
                                   United States District Judge

31